## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| AMERICAN SECURITIES ASSOCIATION, | |
| *Plaintiff,* | |
| v. | No. _____8:24-cv-1377_____ |
| U.S. SECURITIES AND EXCHANGE COMMISSION, | |
| *Defendant.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The American Securities Association (ASA) brings this action against the U.S. Securities and Exchange Commission to compel compliance with the Freedom of Information Act, 5 U.S.C. §552.

### INTRODUCTION

1.     Federal securities law is built on transparency. Financial institutions must perform audits, disclose finances, and preserve records. For good reason: transparency in markets builds trust and promotes fair dealing.

2.     In our democratic system, transparency is a two-way street. Federal law also demands transparency from the government. Under the Freedom of Information Act, the public is entitled to documents created by federal agencies so the people can learn about their government's actions and policies.

3.      This lawsuit concerns the SEC's unprecedented enforcement activities and the agency's refusal to disclose its records of these activities under the Freedom of Information Act.

4.      In the Fall of 2021, the SEC began to investigate certain broker-dealers' retention of "off-channel" communications, such as text messages on personal devices. The SEC demanded scores of documents from numerous companies without any suspicion that they violated the Commission's rules. The period the SEC was investigating included 2020 and 2021, which covered the COVID-19 years when many employees were forced to work from home.

5.      As a result of these investigations, the SEC ultimately entered into settlements that imposed billions of dollars in penalties on broker-dealers.

6.      But there appears to be no rhyme or reason for how the SEC imposed these penalties, and the SEC has provided little explanation into its decisionmaking. The regulated community thus is left with many questions. How were these penalties calculated? And why were they targeted in the first place? Or, as two SEC Commissioners recently put it, is the SEC's penalty-regime simply "a tool to generate numbers for year-end statistics" rather than "a means to achieve outcomes that enhance market integrity and investor protection"?

7.     Seeking answers to these questions, ASA filed requests with the SEC under the Freedom of Information Act to obtain records related to these settlements.

8.     Yet the SEC has refused to comply with its legal obligations. Indeed, the SEC has not produced a single document in response to ASA's FOIA requests. The SEC has pointed to Exemption 7(A), which exempts documents when disclosure could "reasonably be expected to interfere" with ongoing or prospective "enforcement proceedings."

9.     But the SEC concedes that ASA is seeking documents from *settled* proceedings. The SEC cannot withhold documents simply because it may bring *different* enforcement proceedings against *other, unrelated* entities. Such an outcome would license agencies to withhold documents in perpetuity. And even if the SEC could withhold documents on these grounds, it has fallen woefully short of its high burden to justify the withholding, as it has provided nothing but general, boilerplate statements for refusing to comply with ASA's FOIA requests.

10.     FOIA requires transparency from the SEC. The records requested by ASA are not exempt from disclosure. By failing to disclose the requested records, the SEC has violated FOIA.

**JURISDICTION & VENUE**

11.    This Court has jurisdiction over this action under 5 U.S.C. §552(a)(4)(B) and 28 U.S.C. §1331.

12.    Venue is proper under 5 U.S.C. §552(a)(4)(B) and 28 U.S.C. §1391(e) because ASA resides and has its principal place of business in this District.

**PARTIES**

13.    Plaintiff, the American Securities Association, is a trade association that represents the retail and institutional capital-market interests of regional financial services firms who provide Main Street businesses with access to capital and advise hardworking Americans on how to create and preserve wealth. ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. This mission advances financial independence, stimulates job creation, and increases prosperity. ASA has a geographically diverse membership base that spans the Heartland, Southwest, Southeast, Atlantic, and Pacific Northwest regions of the United States. ASA's principal place of business is in Tampa, Florida.

14.    Defendant, the SEC, is an agency of the federal government within the meaning of 5 U.S.C. §552(f) and has possession, custody, and control of the records that ASA seeks.

**BACKGROUND**

**A.    The SEC's Investigatory and Enforcement Power**

15.    The SEC has been given substantial and virtually unchecked power to investigate and enforce the nation's securities laws. *See Jarkesy v. SEC*, 34 F.4th 446, 449 (5th Cir. 2022).

16.    The SEC's investigatory power is far-reaching. The SEC can request documents and issue subpoenas without any evidence that anyone has been harmed. *See SEC v. Marin*, 982 F.3d 1341, 1352-53 (11th Cir. 2020) (emphasis added); *see also* 15 U.S.C. §78u(a)(1).

17.    Complying with an SEC subpoena is not cheap. The unlucky recipients must hire lawyers, collect and image devices, and sort through endless records. Responding to a single subpoena or document request can cost millions of dollars.

18.    Often the SEC's investigation doesn't end with a single subpoena. If the agency doesn't find what it wants, it can simply ask for more records and more documents.

19.    If a violation is found (even if just a foot fault), the SEC has an enormous advantage. The odds stacked in favor of the SEC "reveal just how tilted this game is." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 215 (2023) (Gorsuch, J., concurring in the judgment). The SEC "often acts as both prosecutor and judge." *Jarkesy*, 34 F.4th at 449. This ability to prosecute in

house enables the SEC to achieve "a rate of success notably higher than it has achieved in federal district courts." *Tilton v. SEC*, 824 F.3d 276, 279 (2d Cir. 2016). In recent years, "the SEC has undeniably shifted enforcement to its home court, and it has done so in areas it has designated as high priority for enforcement." Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 U. Pa. J. Const. L. 45, 57 (2016). The agency "win[s] the vast majority of these in-house prosecutions." Adam M. Katz, *Eventual Judicial Review*, 118 Colum. L. Rev. 1139, 1153-54 (2018).

20.    Companies can fight back, but "[l]itigation is particularly risky for a public company: Even if it ultimately prevails, the uncertainty of pending litigation can be disastrous." Sonia A. Steinway, *SEC "Monetary Penalties Speak Very Loudly," But What Do They Say? A Critical Analysis of the SEC's New Enforcement Approach*, 124 Yale L.J. 209, 228 (2014). Indeed, "'the pendency of an investigation places a cloud over the corporation that may inhibit its access to capital markets, chill relationships with vendors and customers, and distract and demoralize management.'" *Id.*

21.    Between the crushing compliance costs, the "threat of significant monetary fines," and the SEC's homecourt advantage, resistance is rarely an option. *Axon Enter.*, 598 U.S. at 204 (Thomas, J., concurring). "Thanks in part to these realities, the bulk of agency cases settle." *Id.* at 216 (Gorsuch, J., concurring in the judgment).

22.     Settlement is often "preferable from the SEC's perspective" too. Steinway, *supra*, at 228. "Since 'settled injunctive actions rarely receive any detailed judicial scrutiny,' these actions ensure a quick 'victory' that can be publicly touted." *Id.* (footnote omitted). "Aware, too, that few can outlast or outspend the federal government, agencies sometimes use this as leverage to extract settlement terms they could not lawfully obtain any other way." *Axon Enter.*, 598 U.S. at 216 (Gorsuch, J., concurring in the judgment).

23.     Then come the penalties, which can be enormous. In 2002, a "$10 million civil penalty was then 'the largest ever levied in a Commission action against a public company for financial fraud.'" Steinway, *supra*, at 210. Those days are long gone. Since 2000, "penalties have grown 30% year-over-year, compared to 3% growth in cases filed." *Id.*

24.     After the dust settles, those who were targeted by the SEC are left to wonder how it all happened. Why did the SEC choose to target certain companies for suspicion-less investigations? How did the SEC arrive at the penalties it imposed?

25.     Because the SEC "has considerable latitude to prioritize its enforcement agenda," the agency has long been criticized for "select[ing] targets not because they are the worst violators, but for improper reasons such as agency or individual self-aggrandizement." *Id.* at 224. For example, "empirical evidence suggests that the SEC targets 'deep pockets' for whom

large-dollar fines will not induce insolvency, as well as violators whose cases will engender positive press." *Id.*

26.     The financial incentive for the SEC to rake in massive penalties has caused the SEC to be "more concerned with generating large penalties than with ensuring" regulatory compliance. Stmt. of Comm'rs Hester M. Peirce & Mark T. Uyeda, *Forget about Collaborating—Stop, Pay-Up, and Listen: Statement on Intercontinental Exchange et al.* (May 22, 2024), bit.ly/3R7f534. The SEC has been imposing "disproportionately large" and "ever-steeper penalties" for "regulatory foot faults" that "bear little to no relation to real-world harm." *Id.* This has led to the "[r]easonable" "perception that the Commission's penalty regime is more a tool to generate numbers for year-end statistics and less a means to achieve outcomes that enhance market integrity and investor protection." *Id.*

27.     Moreover, the SEC has no published guidelines or formulae explaining why it threw the book at one company while giving another similar company a slap on the wrist. To the public and the regulated community, the SEC appears to set the dollar amount of fines in each case inconsistently and unpredictably.

28.     The SEC claims that it "strives to promote a market environment that is worthy of the public's trust and characterized by transparency and integrity." U.S. Secs. & Exch. Comm., *Agency and Mission Information* 9

(2014), perma.cc/Z8ZW-Q5UQ. Federal securities laws, after all, were founded on "'a philosophy of full disclosure.'" *Lorenzo v. SEC*, 587 U.S. 71, 81 (2019).

29.    Yet the SEC doesn't give the transparency that it demands from those it regulates. The SEC hides information about its penalties and settlements, leaving firms and markets in the dark.

**B.    The SEC's Investigation for Alleged Record-Keeping Violations**

30.    In September 2021, the SEC launched a suspicion-less investigation into whether certain broker-dealers were properly retaining business-related text messages sent and received on personal devices as required by the Commission's rules. *See* 17 C.F.R. §240.17a-4.

31.    As part of the investigation, the SEC sent demands to many companies instructing them to produce documents related to their retention of "off-channel" communications, such as text messages through mobile phone apps.

32.    The SEC's investigation included communications made in 2020 and 2021 when COVID-era lockdowns disrupted routines and forced many employees to work from home.

33.    Three months later, the settlements were announced, and the fines started rolling in. On December 17, 2021, the SEC announced that JPMorgan had agreed to pay an astounding $125 million penalty over its recordkeeping practices. *See* Press Release, *JPMorgan Admits to Widespread Recordkeeping*

*Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges*, Secs. & Exch. Comm'n (Dec. 17, 2021), perma.cc/2ZZB-82RV.

34. The following year, on September 27, 2022, the SEC announced an additional $1.1 billion in penalties against 15 broker-dealers and one affiliated investment adviser over their record keeping. *See* Press Release, *SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures*, Secs. & Exch. Comm'n *(*Sept. 27, 2022), perma.cc/98C8-TNR2. These fines were as follows:

| | |
|---|---|
| Barclays Capital Inc. | $125 million |
| BofA Securities Inc. together with Merrill Lynch, Pierce, Fenner & Smith Inc. | $125 million |
| Citigroup Global Markets Inc. | $125 million |
| Credit Suisse Securities (USA) LLC | $125 million |
| Deutsche Bank Securities Inc. together with DWS Distributors Inc. and DWS Investment Management Americas, Inc. | $125 million |
| Goldman Sachs & Co. LLC | $125 million |
| Morgan Stanley & Co. LLC together with Morgan Stanley Smith Barney LLC | $125 million |
| UBS Securities LLC together with UBS Financial Services Inc. | $125 million |
| Jefferies LLC | $50 million |
| Nomura Securities International, Inc. | $50 million |

| | |
|---|---|
| Cantor Fitzgerald & Co. | $10 million |

35.     The following year, in May 2023, the SEC announced settlements with two firms for combined penalties of $22.5 million. *See* Press Release, *SEC Charges HSBC and Scotia Capital with Widespread Recordkeeping Failures*, Secs. & Exch. Comm'n (May 11, 2023), perma.cc/2E94-J3KD. These fines were:

| | |
|---|---|
| HSBC Securities (USA) Inc. | $15 million |
| Scotia Capital (USA) Inc. | $7.5 million |

36.     In August 2023, the SEC announced more settlements with eleven firms for combined penalties of $289 million. *See* Press Release, *SEC Charges 11 Wall Street Firms with Widespread Recordkeeping Failures*, Secs. & Exch. Comm'n (August 8, 2023), perma.cc/39JJ-C3US. These fines were:

| | |
|---|---|
| Wells Fargo Securities, LLC, Wells Fargo Clearing Services, LLC, and Wells Fargo Advisors Financial Network, LLC | $125 million |
| BNP Paribas Securities Corp. | $35 million |
| SG Americas Securities, LLC | $35 million |
| BMO Capital Markets Corp. | $25 million |
| Mizuho Securities USA LLC | $25 million |
| Houlihan Lokey Capital, Inc. | $15 million |
| Moelis & Company LLC | $10 million |
| Wedbush Securities Inc. | $10 million |

| SMBC Nikko Securities America, Inc. | $9 million |
|---|---|

37.    In September 2023, the SEC announced settlements with another ten firms for combined penalties of $79 million. *See* Press Release, *SEC Charges 10 Firms with Widespread Recordkeeping Failures*, Secs. & Exch. Comm'n (Sept. 29, 2023), perma.cc/2HRQ-EP62. These fines were:

| Interactive Brokers Corp. and affiliate Interactive Brokers LLC | $35 million |
|---|---|
| Robert W. Baird & Co. Inc. | $15 million |
| William Blair & Company LLC and affiliate William Blair Investment Management LLC | $10 million |
| Nuveen Securities LLC | $8.5 million |
| Fifth Third Securities Inc. | $8 million |
| Perella Weinberg Partners LP, together with Tudor, Pickering, Holt & Co. Securities LLC and Perella Weinberg Partners Capital Management LP | $2.5 million |

38.    Earlier this year, on February 9, 2024, the SEC announced that another sixteen firms had agreed to pay more than $81 million to settle charges related to their recordkeeping. *See* Press Release, *Sixteen Firms to Pay More Than $81 Million Combined to Settle Charges for Widespread Recordkeeping Failures*, Secs. & Exch. Comm'n (Feb. 9, 2024), perma.cc/TRA5-4MCJ. These fines were:

| | |
|---|---|
| Northwestern Mutual Investment Services LLC, together with Northwestern Mutual Investment Management Co. LLC and Mason Street Advisors LLC | $16.5 million |
| Guggenheim Securities LLC, together with Guggenheim Partners Investment Management LLC | $15 million |
| Oppenheimer & Co. Inc. | $12 million |
| Cambridge Investment Research Inc., together with Cambridge Investment Research Advisors Inc. | $10 million |
| Key Investment Services LLC, together with KeyBanc Capital Markets Inc. | $10 million |
| Lincoln Financial Advisors Corporation, together with Lincoln Financial Securities Corporation | $8.5 million |
| U.S. Bancorp Investments Inc. | $8 million |
| The Huntington Investment Company, together with Huntington Securities Inc. and Capstone Capital Markets LLC | $1.25 million |

39.   In these orders, the SEC provided little to no reasoning for how most of the penalties were calculated. Were they based on the content of the off-channel communications that were sent? The volume of communications collected? The controls that the firm had in place? The seniority of the employees who violated the regulations? Or were the fines entirely arbitrary? It's anyone's guess.

40.   Not surprisingly, the SEC has broken records for enforcement and penalty collections. For fiscal year 2022, the SEC reported $6.439 billion in

orders for civil penalties, disgorgement, and prejudgment interest—the most in SEC history, up from $3.852 billion in the prior year. U.S. Secs. & Exch. Comm., *SEC Announces Enforcement Results for FY22* (Nov. 15, 2022), perma.cc/YSU6-8CVL. The SEC posted similar numbers in 2023, obtaining orders for nearly $5 billion—the second-most in SEC history. U.S. Secs. & Exch. Comm., *SEC Announces Enforcement Results for Fiscal Year 2023* (Nov. 14, 2023), perma.cc/FC7J-S2D2. In both years, a significant driver of the SEC's record recoveries were its investigative sweeps into recordkeeping.

## C.      The Freedom of Information Act

41.     Congress enacted the Freedom of Information Act to provide transparency into agency actions. FOIA "codified 'a strong public policy in favor of public access to information in the possession of federal agencies.'" *Broward Bulldog, Inc. v. DOJ*, 939 F.3d 1164, 1175 (11th Cir. 2019). And FOIA serves to "'ensure an informed citizenry, vital to the functioning of a democratic society.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). Robust enforcement of FOIA is thus "'needed'" to "'hold the governors accountable to the governed.'" *Id.*

42.     FOIA provides that, subject to certain statutory exemptions, federal agencies shall "upon any request for records which . . . reasonably describes such records . . . make the records promptly available to any person." 5 U.S.C. §552(a)(3)(A).

43. Under FOIA, a federal agency must make and communicate a "determination" whether it will comply with a FOIA request—and communicate "the reasons therefor"—within 20 working days of receiving the request, or within 30 working days in "unusual circumstances." 5 U.S.C. §552(a)(6)(A)(i), (a)(6)(B)(i).

44. FOIA's response deadline mandates "more than just an initial statement that the agency will generally comply with a FOIA request and will produce non-exempt documents and claim exemptions in the future." *CREW v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013). Rather, the agency must "(i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.*

45. After a party appeals an agency decision to withhold documents, the agency must "make a determination with respect to any appeal within [20 working] days . . . after the receipt of such appeal," or within 30 working days in "unusual circumstances." 5 U.S.C. §552(a)(6)(A)(ii), (a)(6)(B)(i). And if the agency's decision to withhold documents is upheld on appeal on appeal, "the agency shall notify the person . . . of the provisions for judicial review of that determination." *Id.* Then the requester may sue in federal district court. *Id.*

46.     FOIA gives federal district courts jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. §552(a)(4)(B).

47.     FOIA also allows the requester to recover "reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. §552(a)(4)(E).

**D.     ASA's FOIA Requests**

48.     Relying on FOIA's guarantee of public access, ASA requested information on the SEC's activities.

49.     On March 14, 2024, ASA submitted the following FOIA request to the SEC:

> Please produce all records (including, but not limited to, tables, calculations, schedules, matrices, standards, data, and guidelines) that were considered in connection with calculating, determining, proposing, or agreeing to any penalties, fines, or other sanctions associated with the SEC's recent recordkeeping sweep initiative.
>
> For purposes of this request, "recordkeeping sweep initiative" is defined as any agency action related to possible violations of Section 17(a)(1) of the Exchange Act or Rule 17a-4 based on the use of unapproved communications platforms (such as text messaging on personal devices), including the investigations resolved through the settlements announced on December 17, 2021, September 27, 2022, September 29, 2023, and February 9, 2024. *See JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges* (Dec. 17, 2021), https://perma.cc/2ZZB-82RV; *SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures (*Sept. 27, 2022), https://perma.cc/98C8-TNR2; *SEC Charges 10 Firms with Widespread Recordkeeping Failures* (Sept. 29, 2023), https://perma.cc/2HRQ-EP62; *Sixteen Firms to Pay More*

*Than $81 Million Combined to Settle Charges for Widespread Recordkeeping Failures* (Feb. 9, 2024), https://perma.cc/TRA5-4MCJ.

Produce all such records created or used by the SEC within the past three years, regardless of whether they are drafts, currently in use by the SEC, or previously used by the SEC.

50.     Also on March 14, ASA submitted a second FOIA request to the

SEC:

Please produce all records (including, but not limited to, emails and memoranda) discussing how any penalties, fines, or other sanctions associated with the SEC's recent recordkeeping sweep initiative were calculated, determined, proposed, or agreed to. This request includes any records comparing penalties, fines, or other sanctions across the industry or among individual entities or individuals.

For purposes of this request, "recordkeeping sweep initiative" is defined as any agency action related to possible violations of Section 17(a)(1) of the Exchange Act or Rule 17a-4 based on the use of unapproved communications platforms (such as text messaging on personal devices), including the investigations resolved through the settlements announced on December 17, 2021, September 27, 2022, September 29, 2023, and February 9, 2024. *See JPMorgan Admits to Widespread Recordkeeping Failures and Agrees to Pay $125 Million Penalty to Resolve SEC Charges* (Dec. 17, 2021), https://perma.cc/2ZZB-82RV; *SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures* (Sept. 27, 2022), https://perma.cc/98C8-TNR2; *SEC Charges 10 Firms with Widespread Recordkeeping Failures* (Sept. 29, 2023), https://perma.cc/2HRQ-EP62; *Sixteen Firms to Pay More Than $81 Million Combined to Settle Charges for Widespread Recordkeeping Failures* (Feb. 9, 2024), https://perma.cc/TRA5-4MCJ.

Produce all such records created or used by the SEC within the past three years, regardless of whether they are drafts, currently in use by the SEC, or previously used by the SEC.

17

51.     Also on March 14, ASA submitted a third FOIA request to the SEC:

Please produce all records relating to any credits or benefits that were received for "self-reporting, remediating and cooperating" with the SEC, as used in the following document: SEC Charges 10 Firms with Widespread Recordkeeping Failures (Sept. 29, 2023), https://perma.cc/2HRQ-EP62.

Produce all such records created within the past three years, regardless of whether they are drafts, currently in use by the SEC, or previously used by the SEC.

52.     On March 15, 2024, the SEC sent ASA letters acknowledging receipt of these requests and assigning them tracking numbers of 24-01814-FOIA, 24-01815-FOIA, and 24-01813-FOIA, respectively.

53.     The SEC was required to issue its "determination" by April 11, 2024, but it failed to do so within the statutory deadline.

54.     The SEC then sent ASA belated letters categorically withholding all "records that may be responsive" to ASA's three requests—denying the third request on April 23, the first request on April 25, and the second request on May 2. To justify each withholding, the SEC invoked Exemption 7(A), 5 U.S.C. §552(b)(7)(A), but the SEC did not explain why the Exemption applied or why it justified a blanket withholding of every responsive document.

55.     ASA appealed the SEC's determinations on April 25 and May 2, exhausting its administrative remedies. *See* 5 U.S.C. §552(a)(6)(A)(ii). ASA argued in all three appeals that Exemption 7(A) does not apply because, among other reasons, (1) the SEC "fail[ed] to identify any law enforcement proceedings

that are implicated by the request"; (2) the SEC "fail[ed] to explain how disclosure would interfere with any law enforcement proceedings"; and (3) "Exemption 7(A) does not apply" to "law enforcement proceedings that have ended." ASA also explained that the SEC "fail[ed] to explain how the disclosure would result in foreseeable harm." Finally, ASA argued that the SEC failed to "segregate and produce all nonprivileged and nonexempt material," and indeed provided "no analysis of segregability."

56. On May 22 and 29, the SEC issued three nearly identical decisions on ASA's three appeals, declaring that "the FOIA Officer correctly asserted Exemption 7(A)" in blanket fashion over every responsive document.

57. The SEC recognized that it had "entered into a number of settlements involving the subject matter of [ASA's] request[s]." Yet the SEC concluded that it could withhold documents from these investigations because its Enforcement staff was "investigat[ing] whether the Commission should bring an enforcement action against *other entities* for similar violations of federal securities laws." (emphasis added). The SEC never asserted that the investigations were factually related in any way.

58. The SEC also refused to provide details about how ASA's FOIA requests would "interfere with [these] law enforcement proceedings," merely asserting that the requests would "generally interfere with enforcement proceedings." The SEC hypothesized that responding to ASA's FOIA requests

might allow others to "fabricate evidence, influence witness testimony, and/or destroy or alter certain documents," or "use the information in the documents to tailor the information they provide or withhold in negotiating possible settlements with the Commission."

59.     Finally, the SEC refused to segregate or identify non-exempt documents because, in its view, "all the documents [ASA] requested are exempt." In other words, according to the SEC, *every single document* that ASA requested would "reasonably be expected to interfere with enforcement proceedings" if released to the public. 5 U.S.C. §552(b)(7)(A).

60.     Thus, the SEC has produced no documents in response to ASA's requests.

## COUNT I
## Violation of FOIA, 5 U.S.C. §552

61.     Plaintiff incorporates the allegations in the foregoing paragraphs.

62.     The SEC is an agency of the federal government within the meaning of 5 U.S.C. §552(f)(1).

63.     Plaintiff's FOIA requests complied with all applicable statutes and regulations.

64.     The requested records are not exempt from disclosure.

65.     Exemption 7(A) protects "records or information compiled for law enforcement purposes . . . only to the extent that the production of such law

enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. §552(b)(7)(A). To rely on this exemption, the SEC must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *CREW v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014).

66.    Because "'the mandate of the FOIA calls for broad disclosure of Government records,' . . . FOIA exemptions are to be narrowly construed." *DOJ v. Julian*, 486 U.S. 1, 8 (1988).

67.    "[C]ourts have held that . . . [Exemption] 7(A) . . . allow[s] disclosure of closed investigative files." *Ehringhaus v. FTC*, 525 F. Supp. 21, 23 (D.D.C. 1980). Because the SEC admits that "the Commission entered into a number of settlements involving the subject matter of [ASA's] request," documents related to those settlements are part of closed investigative files and are not exempt.

68.    Moreover, Exemption 7(A) does not allow for "'blanket exemptions' for Government records simply because they were found in investigatory files." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978).

69.    The SEC made no attempt to determine whether responsive documents could be segregated from exempt documents. Instead, the SEC issued "a blanket declaration" that segregation was not possible, which "does

not constitute a sufficient explanation of non-segregability." *Wilderness Soc. v. DOI*, 344 F. Supp. 2d 1, 18 (D.D.C. 2004).

70.    Finally, the SEC has failed to explain how disclosure would result in foreseeable harm. The SEC's conclusory assertions fail to satisfy FOIA's "'meaningful burden'" and "heightened standard" of "describing" the harm that would foreseeably occur, including "both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 105-06 (D.D.C. 2019). The SEC's "'boilerplate statements' and 'generic and nebulous articulations of harm'" are plainly inadequate to invoke Exemption 7(A). *Id.*

71.    Plaintiff has exhausted its administrative remedies by appealing the SEC's adverse determinations. *See* 5 U.S.C. §552(a)(6)(A)(ii).

72.    By failing to release any responsive, non-exempt records, or otherwise offer a reasonable schedule for production, the SEC has violated FOIA. *See* 5 U.S.C. §552(a)(3)(A).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

i.    Declare that the records that ASA seeks in its FOIA requests, as described in this complaint, must be disclosed under 5 U.S.C. §552;

ii.    Order the SEC to search immediately for all records responsive to ASA's FOIA requests and demonstrate that it has employed search

methods reasonably likely to lead to the discovery of responsive records;

iii.     Order the SEC to produce by a date certain all non-exempt records responsive to ASA's FOIA requests and a *Vaughn* index of any responsive records withheld under a claim of exemption;

iv.     Enjoin the SEC from continuing to withhold non-exempt records responsive to ASA's FOIA requests;

v.     Award ASA attorneys' fees and costs incurred in this action in accordance with 5 U.S.C. §552(a)(4)(E); and

vi.     Grant ASA any other relief that this Court finds proper or just.

Dated: June 6, 2024                    Respectfully Submitted,
                                        */s/ Daniel Shapiro*

                                        J. Michael Connolly*
                                            *Lead Counsel*
                                        Daniel Shapiro (Florida Bar #1011108)
                                        Steven C. Begakis*
                                        Conor D. Woodfin*
                                        CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Suite 700
                                        Arlington, VA 22209
                                        (703) 243-9423
                                        mike@consovoymccarthy.com
                                        daniel@consovoymccarthy.com
                                        steven@consovoymccarthy.com
                                        conor@consovoymccarthy.com

                                        *Attorneys for Plaintiff*
                                        *American Securities Association*

                                        *\*Pro hac vice motions forthcoming*